UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Leroy Jacobs, individually and on behalf of all others similarly situated, | 1:22-cv-00002 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Whole Foods Market Group, Inc., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.     Whole Foods Market Group, Inc. ("Defendant") manufactures, labels, markets, and sells boxes of Long Grain & Wild Rice – Rice Pilaf, under its 365 brand ("Product").

## I.     CONSUMERS VALUE BIGGER PACKAGING

2.     The average consumer spends 13 seconds making an in-store purchasing decision.

3.     Faced with a large and a smaller box, consumers choose the larger box, thinking it is a better value.

4.     Studies show approximately 80 percent of consumers do not look at label information, especially the net weight and servings.

5.     Though a reasonable consumer does not expect a package to burst at the seams, they expect the amount of product bears a reasonable relationship to the size of the package.

## II.     WHOLE FOODS' COMMITMENT TO SUSTAINABLE PRACTICES

6.     Defendant's digital, print, television, and in-store marketing touts its commitment to

sustainability and environmental stewardship, formally embodied in corporate policies.[1]

Home / **Mission In Action** / Environmental Stewardship

# Environmental Stewardship

We're always looking for ways to do more for our planet — because we believe it's worth it for our customers, team members and suppliers. Whether it's diverting food waste from landfills or making our stores more energy efficient, learn how we're promoting environmental stewardship to make our earth happier for the future.

7.      Defendant tells customers, "We Care About Our Communities and the Environment experience."

8.      Defendant recognizes the global devastation caused to the planet by excess waste, affirming, "We balance our needs with the needs of the rest of the planet so that the Earth will continue to flourish for generations to come," and "We are committed to reduced packaging, composting and water and energy conservation."

9.      Like many global environmental groups, Defendant recognizes the grave threat to the planet and ecosystems caused by the proliferation of plastic waste.

10.      Defendant promotes its "Commitment to Reducing Single-Use Plastics."

---

[1] Whole Foods, Environmental Stewardship.

Home / Mission In Action / Environmental Stewardship / Our
Commitment To Reducing Single-Use Plastics

# Our Commitment to Reducing Single-Use Plastics

Learn about our achievements and ongoing programs that work to
reduce plastic across store departments and nourish our planet.

11.　In 2007, Defendant was the first food retailer to introduce 100% post-consumer recycled-content paper bags, certified by the Forest Stewardship Council.

12.　The next year, Defendant banned plastic grocery bags at checkout.

13.　Defendant offers a wide selection of reusable bags at nominal prices.

14.　In 2019, in response to the accelerating environmental harm from excess packaging materials, Defendant introduced smaller pull bags for all fresh produce.



**Smaller Produce Bags**

In 2019, we introduced smaller produce pull bags for our fresh fruits, vegetables and herbs. **Our packaging manufacturer estimates that this change saves 213,408 pounds (or 106.7 tons) of plastic annually.**



**Reusable Grocery Bags**

We also offer a wide selection of reusable grocery bags in a variety of colors and sizes at affordable prices. Just pick one up at the checkout in your store.

15.　Each year, this saves 213,408 pounds (or 106.7 tons) of plastic.

16.　Defendant's commitment to sustainable packaging is also evident through its elimination of Styrofoam (polystyrene), used for meat packaging trays and in other areas.

17.　In 2019, Defendant's prepared foods department was the first in the nation to replace

3

all hard plastic rotisserie chicken containers with reduced plastic bags.

18.    These bags use 70% less plastic, saving nearly 1.7 million pounds of plastic annually.



**Styrofoam-Free Packaging**

We've eliminated all Styrofoam (polystyrene) meat packaging trays in all our stores in the U.S. and Canada We've also removed all Styrofoam from our food service packaging.



**Reduced Plastic Rotisserie Chicken Bags**

As of October 2019, we replaced all hard plastic rotisserie chicken containers with bags that use approximately 70% less plastic, which **our packaging manufacturer estimates saves nearly 1.7 million pounds of plastic annually.**

### III.    EMPTY SPACE IN DEFENDANT'S LONG GRAIN & WILD RICE BOXES

19.    The box measures, in inches, 6.75 (height) by 4.25 (length) and 1.5 (width).



20.    Judging from the size of the box, reasonable consumers expect it to be substantially filled with rice and contain the packet of seasoning.

21.    However, over 50% of the box is empty space, because the rice and seasoning packages correspond to 3.25 inches on the tape measure.



22.    Consumers are misled into believing that they are purchasing substantially more rice than they receive.

## IV.    NO LEGITIMATE REASONS FOR EMPTY SPACE

23.    Federal and identical state regulations recognize that deceptive packaging can be used to the detriment of consumers, but also that there are valid reasons ("safe harbors") for why

foods may have what appears to be excess space, or slack-fill. *See* 21 C.F.R. § 100.100 ("Misleading containers.").

24.     For slack-fill to be deemed nonfunctional, the empty space cannot be due to one of the six recognized safe harbors. 21 C.F.R. § 100.100(a)(1)-(6) ("Safe Harbors").

25.     First, the rice and flavor packets do not require more than 50% empty space to protect them from damage, as they are not at risk of breakage. *See* 21 C.F.R. § 100.100(a)(1) ("Protection of the contents of the package").

26.     This is in contrast to potato chips, which contain a significant amount of air, to prevent the contents from being crushed and the chips destroyed.

27.     In fact, rice would be better protected in a smaller box, because all of the excess air at the top allows other items to press against this portion of the box, possibly causing it to "pop" or be damaged.

28.     Second, there are no requirements of the machines used to enclose the contents that would leave over 50% of empty space. *See* 21 C.F.R. § 100.100(a)(2) ("The requirements of the machines used for enclosing the contents in such package").

29.     There is no reason the machines used for enclosing rice grains in the plastic packaging cannot use less plastic and contain the same amount of rice.

30.     There is no reason the machines used for enclosing the rice's plastic packaging cannot form a box in dimensions other than 6.75 (height) by 4.25 (length) and 1.5 (width) (inches).

31.     The machines used to form the box can be adjusted if the rice packaging was reduced.

32.     Defendant sells similar rice products with seasoning, in similar or identical sizes, that contain significantly less slack-fill.

33.     For example, one of these products rice produce contains approximately 20% slack

fill, as opposed to over 50% of slack fill contained in the Product.

34. Third, no issue exists with respect to the rice and flavor packets settling during shipping and handling. *See* 21 C.F.R. § 100.100(3) ("Unavoidable product settling during shipping and handling")

35. The rice grains and seasoning are dense, and no settling occurs after they are deposited into their separate plastic packaging, which is placed in the box.

36. No additional product settling occurs during subsequent shipping and handling.

37. Additionally, Defendant's other similarly sized rice products do not contain over 50% of empty space.

38. Fourth, the packaging is not required to perform a specific function, i.e., play a role in the preparation or consumption of a food. *See* 21 C.F.R. § 100.100(4).

39. The packaging is there to hold the rice and flavor packet and not needed to consume the Product.

40. Fifth, the box is not a "reusable container," nor part of the presentation of the rice and seasoning and does not have value in proportion to the value of the product, independent of its function to hold the food. *See* 21 C.F.R. § 100.100(5).

41. This is confirmed because the box and plastic packaging are discarded after.

42. Sixth, no inability exists to increase the amount of rice or to reduce the size of the plastic and outer packaging to a minimum size necessary to accommodate required food labeling or perform another purpose. *See* 21 C.F.R. § 100.100(6).

43. It is easier to use smaller plastic and cardboard packaging, because this will still provide space for the contents, and save money on packaging materials.

44. This is confirmed by Defendant's similar products which contain significantly less

empty space.

45.    Defendant can modify the labeling to eliminate or reduce deception by adding a fill line, transparent window, or actual amount depiction accompanied by the words "actual amount."

46.    There is no need for a tamper resistant device, and the Product is sold without one.

47.    The presence of a tamper resistant device is not a barrier to reducing the size of the rice's plastic packaging and the cardboard box.

48.    Because the package does not allow consumers to view its contents, and contains nonfunctional slack-fill, the packaging is misleading to consumers.

**V.    DEFENDANT MATCHES PRODUCT SIZE TO SHELF HEIGHTS**

49.    Studies confirm that a common practice of retailers, including Defendant, is to match the height of product packaging to shelf heights.

50.    This makes the shelves look full, which appeals to consumers and makes them willing to spend more money.

51.    This shows a deliberate attempt, and knowledge, to mislead consumers.

**VI.    EXCESS PACKAGING VIOLATES DEFENDANT'S ENVIRONMENTAL COMMITMENTS TO CONSUMERS**

52.    Defendant promised customers, through digital, print, audio, television, and in-store placards and signs, that it is replicating its reduction in excess packing materials across all aspects of its operations, to promote environmental welfare.

53.    Defendant recognizes that non-functional slack-fill aggravates the climate, waste and plastic pollution crisis at all stages, from resource extraction, production, distribution, transport in collection systems, landfilling, incineration and recycling.

54.    The effects are twofold, because excess packing materials are made from raw materials that would not otherwise have been used, and once the item is used and consumed, the

excess materials are discarded.

55.     Often, disadvantaged communities, either in this country, or abroad, are the locations where plastic and other waste materials are transported, where open burning of waste materials is commonplace.

56.     This causes emission of carbon dioxide and other toxic compounds into the atmosphere and fragile ecosystems.

57.     Defendant's excess packaging violates its pledges and commitments to consumers that it will operate sustainably and promote environmental stewardship.

58.     Defendant intentionally packages the Product in opaque cardboard containers that are constructed in such a way that does not allow for a visual or audial confirmation of the contents of the Product.

## VII.  CONCLUSION

59.     The Product contains other representations which are misleading.

60.     Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

61.     The value of the Product that Plaintiff purchased was materially less than its value as represented by defendant.

62.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

63.     Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

64.     The Product is sold for a price premium compared to other similar products, no less

than $2.99 per 6 oz (170g), a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

## Jurisdiction and Venue

65.    Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

66.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

67.    Plaintiff Leroy Jacobs is a citizen of Illinois.

68.    Defendant Whole Foods Market Group, Inc., is a Delaware corporation with a principal place of business in Austin, Travis County, Texas

69.    Defendant transacts business within this District through sale of the Product directly to residents from its website and that of its corporate parent, Amazon.com, and its numerous stores in this District.

70.    Venue is in this District because Plaintiff resides in this District and the actions giving rise to the claims occurred within this District.

71.    Venue is in the Eastern Division in this District because a substantial part of the events or omissions giving rise to the claim occurred in Cook County, i.e., Plaintiff's purchase of the Product and his awareness of the issues described here.

## Parties

72.    Plaintiff Leroy Jacobs is a citizen of Chicago, Cook County, Illinois.

73.    Defendant Whole Foods Market Group, Inc., is a Delaware corporation with a principal place of business in Austin, Texas, Travis County.

74.    Whole Foods operates over five hundred stores in the United States.

10

75. Whole Foods also sells its products through the internet, via its own website, and via the website of corporate parent, Amazon.com, Inc. ("Amazon").

76. The Product is available at all of Defendant's stores and from its online platforms.

77. Defendant has final responsibility and authority for the labeling, packaging, and production of all items bearing the 365 brand, shown below.



78. Whole Foods is self-described as "more than just a grocery store," because it maintains the "strictest quality standards."

79. These standards include a commitment to the food it provides and ensuring it provides these foods in a way which does not negatively impact the environment.

80. Whole Foods promises customers that it carefully vets its products to make sure they only sell the "highest quality natural and organic foods," by researching ingredients, auditing sourcing practices, and maximizing its commitment to sustainability and environmental stewardship, which entails elimination of excess packaging material which contributes to the global plastic and climate crises.

81. These facts show a company with a significant amount of goodwill, trust and equity when it comes to consumer purchasing.

82. While Whole Foods stores sell leading national brands, they sell a large number of

11

products under one of their private label brands, 365.

83.    Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

84.    Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

85.    Products under the 365 brand have an industry-wide reputation for quality and value.

86.    In releasing products under the 365 brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

87.    Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

88.    That 365 branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

89.    Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

90.    A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

91.    Private label products under the 365 brand benefit by their association with consumers' appreciation for the Whole Foods brand as a whole.

92.    The development of private label items is a growth area for Whole Foods, as they select only top suppliers to develop and produce 365 products.

93.    Plaintiffs were aware of this commitment to customer satisfaction when they bought the Product, because they knew if anything went wrong, Defendant would "make it right."

94.    These facts show a company with a significant amount of goodwill and equity when it comes to consumer purchasing.

95.    Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Whole Foods, 6009 N Broadway Chicago, IL 60660 between September and December 2021, among other times.

96.    Plaintiff could not and did not reasonably understand or expect any of the net weight or serving disclosures to translate to an amount of rice meaningfully different from his expectation of an amount which would fill up the box.

97.    Only when Plaintiff opened the box did he discover, to his disappointment, that it was less than half-full.

98.    Plaintiff bought the Product because he expected it contained an amount of rice that had a reasonable relationship to the packaging in which it was presented because that is what the representations said and implied.

99.    Plaintiff relied on the words and images on the Product, on the labeling, statements, and/or claims made by Defendant in digital, print and/or social media, which accompanied the Product and separately.

100.    Plaintiff was aware of Defendant's environmental pledges and commitments, through its extensive marketing and advertising, in its stores and across various media.

101.    Plaintiff was disappointed because the Product's excess packaging was inconsistent with Defendant's promises about sustainability and environmental stewardship, and its claim it would reduce the use of raw materials in packaging.

102.    Plaintiff bought the Product at or exceeding the above-referenced price.

103.    Plaintiff would not have purchased the Product if he knew the representations and

omissions were false and misleading or would have paid less for it.

104. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

105. The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

106. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance the Product's representations are consistent with its abilities and/or composition.

107. Plaintiff is unable to rely on the labeling and representations about the issues described here for not only this Product, but other similar products, because he is unsure of whether those representations are truthful.

## Class Allegations

108. Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of an:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and a
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Pennsylvania, Michigan, Iowa, Rhode Island, Minnesota, Ohio, Georgia, North Dakota, Texas, New Mexico, North Carolina, Virginia, New Hampshire, South Dakota, and Oklahoma, who purchased the Product during the statutes of limitations for each cause of action alleged.

109. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

110. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

111. Plaintiff is adequate representative because his interests do not conflict with other members.

112.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

113.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

114.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

115.  Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act</u>
<u>("ICFA"), 815 ILCS 505/1, et seq.</u>

<u>(Consumer Protection Statute)</u>

116.  Plaintiff incorporates by reference all preceding paragraphs.

117.  Plaintiff and class members desired to purchase a product that contained an amount of rice that had a reasonable relationship to the packaging in which it was presented.

118.  Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

119.  Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

120.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

121.  Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

122.  Plaintiff relied on the representations that the Product contained an amount of rice that had a reasonable relationship to the packaging in which it was presented

123.   Plaintiff and class members would not have purchased the Product or paid as much

if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

124.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the ICFA and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

125.   Defendant intended that each of members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

126.   As a result of defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the other members of the Consumer Fraud Multi-State Class, have sustained damages in an amount to be proven at trial.

127.   In addition, defendant's conduct showed motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,<br>Implied Warranty of Merchantability/Fitness for a Particular Purpose and<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <em>et seq</em>.

128.   The Product was manufactured, identified, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it contained an amount of rice that had a reasonable relationship to the packaging in which it was presented.

129.   Defendant directly marketed the Product to consumers through its advertisements and partnerships with other entities, through various forms of media, and in print circulars.

130.   Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing to directly meet those needs and desires.

16

131.   Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product contained an amount of rice that had a reasonable relationship to the packaging in which it was presented

132.   Defendant's representations affirmed and promised that the Product contained an amount of rice that had a reasonable relationship to the packaging in which it was presented.

133.   Defendant described the Product as one which contained an amount of rice that had a reasonable relationship to the packaging in which it was presented, which became part of the basis of the bargain that the Product would conform to its affirmation and promise.

134.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

135.   This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high quality products.

136.   Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

137.   Plaintiff hereby provides notice to Defendant that it has breached the express and implied warranties associated with the Product.

138.   Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

139.   The Product did not conform to its affirmations of fact and promises due to defendant's actions.

140.   The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the

promises or affirmations of fact made on the container or label.

141. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it contained an amount of rice that had a reasonable relationship to the packaging in which it was presented, and he relied on Defendant's skill or judgment to select or furnish such a suitable product.

142. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

143. Defendant had a duty to truthfully represent the Product, which it breached.

144. This duty is based on defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company known for its high quality products.

145. Defendant's representations regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and pledges.

146. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

147. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant.

148. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

149. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

150.  Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained an amount of rice that had a reasonable relationship to the packaging in which it was presented.

151.  Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and/or constructive knowledge of the falsity of the representations.

152.  Defendant knew of the issues described here yet did not address them.

153.  Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

<u>Unjust Enrichment</u>

154.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

  **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   January 1, 2022

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan

60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com